The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Kim L. Cramer, and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence; rehear the parties or their representatives; or amend the Opinion and Award. Accordingly, the Full Commission affirms the Opinion and Award of Deputy Commissioner Kim L. Cramer, with modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties through the Pre-trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to and bound by the North Carolina Workers' Compensation Act.
2. On the date of plaintiff's alleged injury, an employee-employer relationship existed between plaintiff and Sumitomo Electric Lightwave Corporation.
3. Plaintiff's alleged date of injury was 9/10/97.
4. Plaintiff's average weekly wage is to be determined. (No Form 22 wage chart was submitted.)
5. Plaintiff is alleging that she has sustained injury due to an occupational disease, which defendants deny.
 ***********
Based upon the competent evidence of record and the reasonable inferences therefrom, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. At the time of the hearing, Ms. Ruffin was 47 years old, having been born on October 8, 1951. She has a high school diploma. Just prior to the hearing, Ms. Ruffin completed an Introduction to Computer class through Goodwill Industries. The Workers' Compensation carrier in this case has never given Ms. Ruffin any vocational assistance. She previously worked as a sewer for Burlington Mills until the plant closed. In April 1985, she began working as a machine operator for the defendant Sumitomo, at a plant which makes fiber optic cable. Plaintiff last worked for defendant in April 1998.
2. From April 1985 through April 1998, plaintiff was employed by Sumitomo in production technician jobs. This work involved producing glass preforms for fiber optic devices. She worked twelve (12) hour shifts in a three/four day on-off rotating schedule. From 1985 to 1994 plaintiff worked with Sumitomo as a production technician on the Ar Furnace. This job required extensive climbing up and down stairs to properly measure, set, and align the furnace prior to each run. Ms. Ruffin had to climb up and down these stairs approximately 28 times each 12-hour shift. Defendants' witness, Robert Arey, who was the Manager of Preform Production, verified this. [28 x 10 = 280 stairs per day x 4 day work week = 1,120 stairs per week] The job also required prolonged standing on the concrete and steel floors of the plant.
3. Although Ms. Ruffin rotated jobs during this period, over time her knees began to suffer greatly from the strain of walking up and down the stairs and persistent standing. The more stair climbing she did, the more she hurt. She sought medical treatment from Dr. Lyman Smith at Raleigh Orthopaedic Clinic for injuries to her right knee. The Workers' Compensation carrier accepted this. She was placed on work restrictions and taken off operation of the Ar Furnace in 1994.
4. Plaintiff was then moved exclusively to operating lathes. While this job did not require her to climb stairs, the job was still performed on her feet. It also involved substantial walking back and forth to operate the machines over the course of 12-hour shifts. Plaintiff was usually unable to sit down after setting up the machines because she was required to run two lathes at a time. While one was running, she had to be on her feet setting up the other. This was confirmed by Mr. Arey who said the "general expectation" was for Ms. Ruffin to operate two machines at a time. This resulted in Ms. Ruffin having to stand approximately 75% percent of the time during her 12-hour shift.
5. During the performance of this job Ms. Ruffin began experiencing significant swelling in her feet and right ankle. The swelling would subside when she was not at work. The symptoms became so severe she left work and sought help from Dr. Richard Hauser at Central Carolina Podiatry Associates. Dr. Hauser first tried putting her ankle in a soft cast. After that was unsuccessful, she wore a hard cast. She tried to continue working throughout this treatment.
6. She was then referred to the company doctor, Dr. Christian Lambertsen. Dr. Lambertsen performed no examination of her ankle, as it was still in the hard cast. He merely looked at the records and pronounced the condition not to be work-related. Workers' Compensation refused to send her to another doctor. She sought treatment from Dr. Paul Wright at Durham Orthopaedic Clinic on her own for problems with her left knee. He diagnosed torn cartilage due to her work and performed two surgeries on her left knee.
7. Dr. Hauser restricted Ms. Ruffin to sitting-type jobs. Ms. Ruffin spoke with Mr. Arey and Mr. Eddie Stevens, the plant Personnel Manager, about locating jobs within her restrictions. She was told there were none. Plaintiff believed there were two jobs at Sumitomo that were seated in nature. These were the jobs of Computer Control Production Clerk and Computer Inspector. She also believed Sumitomo had job openings in Production Control since her last date working there. Plaintiff's Exhibit 2, an application for employment with Sumitomo dated June 2, 1999 for a Production Control Clerk position, was admitted into evidence. Ms. Ruffin never received a response. Regarding other job search attempts, plaintiff had finished her computer class through Goodwill Industries and had sent out many resumes but received no responses.
8. Ms. Ruffin was still treating with Dr. Hauser, her podiatrist, and Dr. Wright, her orthopaedic surgeon, at the time of the hearing before the Deputy Commissioner. She is satisfied with their treatment and has asked the Industrial Commission to designate them as her treating physicians. Her right ankle problems first started when she kicked a bedpost at home in March of 1992.
9. At the time of the hearing before the Deputy Commissioner plaintiff's symptoms included considerable swelling of her right foot and both of her knees with any prolonged standing. She must apply ice to reduce the swelling. She also is still on medications. No doctor has ever released her to return to her previous work.
10. On February 18, 1994, plaintiff was seen by Dr. Lyman Scott William Smith, an orthopaedic surgeon with Raleigh Orthopaedic Clinic, for complaints of pain in her right knee, without any specific injury. Dr. Smith noted that she was obese. Medical records later show her height as 5 feet 2 inches and her weight at 230 pounds. On examination of her knee, Dr. Smith found a full range of motion and a stable knee, with some tenderness over the patella but no swelling. He diagnosed kneecap pain. Dr. Smith prescribed exercises, gave plaintiff anti-inflammatory medication and a knee sleeve for comfort.
11. Plaintiff was seen again at Raleigh Orthopaedic Clinic on March 28, 1994, by Physicians Assistant Albert Hedgepath, in conjunction with Dr. McDaniel. Examination showed some crepitus of the kneecap with motion, but otherwise a normal knee without effusion. A different anti-inflammatory medicine was given. Plaintiff was advised to avoid kneeling, squatting, and climbing stairs and ladders as much as possible.
12. Following that examination, Sumitomo changed plaintiff's job duties so that she was no longer required to climb stairs. When plaintiff returned to see Dr. Smith on April 15, 1994, she reported that she was no longer climbing stairs at work. She was given a note for continued light duty with no kneeling, squatting, climbing stairs or ladders.
13. When plaintiff was seen again by Dr. Smith on May 13, 1994, he noted some tenderness over the patella and medial joint line; otherwise the examination was completely normal. Plaintiff had been discharged from physical therapy due to her difficulty maintaining attendance.
14. By July 13, 1994, Dr. Smith noted that plaintiff was 50 to 80 percent improved. The examination showed the same tenderness as before consistent with chondromalacia. Plaintiff was seen again on September 13, 1994, when she was released to return as necessary.
15. Plaintiff did not return to Raleigh Orthopaedic until March 17, 1999, with complaints of her right knee. Dr. Smith found a full range of motion with stable right knee, with some mild tenderness. He concluded that her right knee "looked pretty good" and that she might benefit from some physical therapy.
16. The date of alleged injury noted in the pre-trial agreement is September 10, 1997, which is the same date given on the plaintiff's Form 18, which was filed with the Commission on January 14, 1999. This is three and one-half years after the first complaints of knee pain. The parties have made no stipulations with regard to the compensability of the right knee injury and there are no forms in the Commission file (IC 905308) to indicate that the defendants ever accepted the knee as compensable. However, the briefs of both attorneys appear to treat the right knee injury as if it had been accepted as compensable, although the defendants clearly deny the extent of the consequences.
17. On September 10, 1997, plaintiff returned to see Dr. Hauser for the first time in over four years. She complained of pain and swelling in her right medial ankle after being on her feet for an extended period of time. Dr. Hauser assessed plaintiff with tendonitis and tendon dysfunction and applied an unna boot for the next week.
18. Plaintiff returned on September 17, and the unna boot was removed. She was placed in a short leg fiberglass walking cast, to allow the tendon to rest, and given Advil. The cast was removed on October 8, 1997, and she was given a removable walking cast. Dr. Hauser also prescribed physical therapy to build up strength and range of motion.
19. Plaintiff has continued to see Dr. Hauser in follow-up for her right ankle tendonitis, as recently as January 1999.
20. Dr. Hauser rendered an opinion, and the Full Commission finds as fact, that plaintiff's employment duties of climbing stairs and standing on her feet for long periods of time were significant contributing factors to the aggravation of plaintiff's right foot tendonitis and tended to make it a chronic condition. Dr. Hauser also stated his opinion, which the Full Commission finds as fact, that plaintiff's duties, which required her to be on her feet for long periods of time placed her at greater risk of developing such tendonitis.
21. The only evidence to contradict Dr. Hauser's opinion is the testimony of Dr. Christian Lambertsen, who reviewed plaintiff's medical records, but did not personally examine her. Although he practices occupational medicine, Dr. Lambertsen is board-certified in family medicine and not in occupational medicine or orthopaedics. Dr. Lambertsen's testimony was at times indefinite and was not persuasive.
22. While it is clear that plaintiff's original right ankle injury was not caused by her employment, and was clearly aggravated by her obesity, the greater weight of the evidence establishes that the duties of her employment were also significant factors which aggravated her ankle injury over the years leading to a chronic condition. Plaintiff's employment contributed to her right ankle tendonitis and placed her at a greater risk of aggravation of this condition.
23. Plaintiff has also been treated by Dr. Paul Wright of Durham Orthopedic Clinic, who first saw her on January 22, 1998. At that time she complained of pain in her left knee, which had, began one to two months prior with no apparent injury. She also complained that her right knee tended to give way.
24. Dr. Wright examined both knees. He assessed her with tendonitis and bursitis of the left knee and tendonitis or the right ankle and pronation of both feet. In follow-up on February 19, Dr. Wright assessed patella tendonitis of both knees. (It appears there is a date error on the medical notes, which state 2/19/97, whereas Dr. Wright testified that her first visit to him was on 1/22/98.) On this date, Dr. Wright gave her a knee sleeve for the left knee.
25. When plaintiff continued to complain that she was not improving, on April 3, 1998, Dr. Wright ordered an MRI of the left knee. The MRI, which was done on April 16, showed a tear of the lateral meniscus over the interior through the posterior horn. After reviewing these results, Dr. Wright performed arthroscopic surgery on the left knee on May 5, 1998. Following the surgery, in his notes of May 18, 1998, Dr. Wright noted some postoperative synovitis. As of June 15, 1998, Dr. Wright noted plaintiff was making excellent progress following the surgery.
26. On her visit of August 27, 1998, plaintiff complained to Dr. Wright of increasing pain in her left knee. Dr. Wright found fluid on the left knee, which he aspirated. He assessed plaintiff with recurrent synovitis, left knee greater than right.
27. In follow-up in October 1998, plaintiff again had swelling in the left knee, and a repeat MRI showed fluid around the patella tendon area. Dr. Wright strongly recommended to plaintiff an aspiration and injection, which she declined both in her October 29 and November 12, 1998 visits. Dr. Wright then recommended open exploration of the knee, and this was done on November 25, 1998.
28. Dr. Wright continued to follow plaintiff for her knee complaints, with the last visit of the record in this case being on March 5, 1999. It is Dr. Wright's opinion that plaintiff will continue to need medical management for her both knee conditions, and may later need surgery on her right knee. Dr. Wright's opinion is that plaintiff's left knee is at maximum improvement following her open surgery, while he has not made that assessment with regard to the right knee.
29. Both Dr. Wright and Dr. Smith rendered opinions, which the Full Commission finds as fact, that plaintiff's knee conditions, right and left, were most likely caused or significantly aggravated by her work duties, which included climbing stairs (until 1994) and long periods of standing. Both physicians agreed that her employment, which required prolonged standing, placed her at greater risk for developing these types of knee problems. Their testimony is not contradicted and is persuasive.
30. Based upon the greater weight of the evidence, plaintiff's bilateral knee problems for which she has sought medical attention beginning in 1994 are causally related to her employment with Sumitomo. Despite other factors, which contributed to her knee problems, such as her weight, her employment duties were a significant contributing factor to her knee problems. Her job duties, especially climbing stairs and standing for long periods of time placed her at a greater risk of developing such knee problems.
31. As a result of her foot and knee injuries related to her employment, plaintiff has been unable to perform the duties of her regular employment with defendant for the following periods of time: September 10, 1997 to January 5, 1998; February 7, 1998 to March 16, 1998, and April 7, 1998 to the close of the evidence in this matter. She will be unable to return to any employment, which requires stair climbing, squatting or kneeling, or prolonged standing.
32. As a result of her foot and knee injuries related to her employment, plaintiff has been partially disabled from performing the duties of her regular employment from January 6, 1998 to February 6, 1998 and from March 17, 1998 to April 6, 1998. During these periods, she worked limited hours.
33. As a result of her foot and knee injuries related to her employment, plaintiff has been unable to engage in any other employment for which she was qualified during the periods noted above when she was unable to perform her duties with her employer. Plaintiff will need vocational assistance to provide her with skills for pursuing other employment opportunities. At the time of the hearing before the Deputy Commissioner, she had completed a computer skills course through Goodwill. Defendants have not provided any vocational assistance.
34. William T. Clark, Jr. testified for defendants. He confirmed Ms. Ruffin had never been offered any job within her limitations. He also admitted Sumitomo has had openings for computer production positions and for positions that have sit/stand options. However, none have been offered to plaintiff. He confessed the reason for this was the company would neither hire nor consider her for employment because its records confirmed she was disabled and not to be considered.
35. No Form 22 or other wage chart for the 52 weeks preceding September 10, 1997 has been submitted although it was the responsibility of defendants to submit it. The Opinion and Award of the Deputy Commissioner required that defendants file a Form 22 wage chart within 15 days of the filing date of the Opinion and Award or suffer possible sanctions. As of the filing date of this Opinion and Award of the Full Commission, defendants were still in violation of this mandatory order. The only items available are discovery responses, which show plaintiff had "gross wages" of $29,180.10 for 1996 and $27,097.03 for 1997. Her gross wages for 1996 would result in an average weekly wage of $561.15 and her gross wages for 1997 (the year of the "injury") would result in an average weekly wage of $521.09. Where, as here, the other methods of calculating an average weekly wage set out in Section 97-2(5) of the General Statutes would be unfair to either party, such other method of computing average weekly wages may be resorted to as will most nearly approximate the amount which the injured employee would be earning were it not for the injury. Without a wage chart, the fairest standard to both would be the calendar year prior to the onset of the occupational disease. The Full Commission therefore determines plaintiff's average weekly wage to be $561.15, yielding a compensation rate of $374.07 per week.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. A disease is an occupational disease compensable under N.C. Gen. Stat. § 97-53 (13) if claimant's employment exposed him "to a greater risk of contracting this disease than members of the public generally . . ." and such exposure "significantly contributed to, or was a significant causal factor in, the disease's development." Rutledge v.Tultex Corp., 308 N.C. 85, 101, 301 S.E.2d 359, 369-70 (1983). Ultimately, the Commission must determine "whether the occupational exposure was such a significant factor in the disease's development that without it the disease would not have developed to such an extent that it caused the physical disability which resulted in claimant's incapacity for work." Id. at 102, 301 S.E.2d at 370. If the occupational exposure in question is such that it augments the disease process to any degree, however slight, the employer is liable. Rutledge, 308 N.C. at 89,301 S.E.2d at 362.
2. As a result of her employment with the defendant-employer, plaintiff has developed bilateral patella tendonitis. The evidence establishes that plaintiff's employment with the defendant-employer was a significant contributing factor to the development of her chronic bilateral knee conditions, and that her employment placed her at an increased risk of developing these problems when compared to the general public. Therefore, her bilateral knee injuries are compensable as an occupational disease pursuant to N.C. Gen. Stat. § 97-53(13).
3. As a result of her employment with the defendant-employer, plaintiff's right ankle tendonitis, which arose from a non-work-related injury in 1992, was significantly aggravated. Her employment duties with defendant-employer placed her at an increased risk for aggravation of her ankle condition. Therefore, the consequences of and treatment for plaintiff's ankle injuries beginning with her follow-up with Dr. Hauser in 1997 are compensable pursuant to N.C. Gen. Stat. § 97-53(13).
4. Defendants are responsible for payment for all expenses incurred by plaintiff for reasonably necessary medical treatment rendered for her bilateral knee injuries and for all such treatment for her right ankle as of September 10, 1997. N.C. Gen. Stat. §§ 97-2(19), 97-25.
5. As a consequence of her bilateral knee injuries and her ankle injury, plaintiff has been unable to earn wages in the same or any other employment and has been temporarily totally disabled for the following dates: September 10, 1997 to January 5, 1998; February 7, 1998 to March 16, 1998, and April 7, 1998 to the close of the evidence in this matter. Plaintiff is entitled to compensation for total disability during these periods and from April 7, 1998 and continuing until further order of the Commission. N.C. Gen. Stat. § 97-29. As plaintiff has established continuing disability, the burden is on the defendants to show that she is capable of returning to gainful employment. Radica v. CarolinaMills, 113 N.C. App. 440 (1994).
6. As a consequence of her bilateral knee injuries and her ankle injury, plaintiff has been unable to earn full wages in her regular employment and has been partially disabled for the following dates: from January 6, 1998 to February 6, 1998 and from March 17, 1998 to April 6, 1998. Plaintiff is entitled to compensation for partial disability during these periods pursuant to N.C. Gen. Stat. § 97-30.
6. Plaintiff will need ongoing treatment for her knees, and to the extent that the same is reasonably necessary, defendants are responsible for payment for such ongoing medical treatment. N.C. Gen. Stat. §§97-2(19), 97-25.
7. Plaintiff's average weekly wage was $561.15, yielding a compensation rate of $374.07 per week. N.C. Gen. Stat. § 97-2(5).
 ***********
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following
 AWARD
1. Defendants shall pay all expenses incurred or to be incurred by plaintiff for all reasonably necessary medical treatment rendered for her bilateral knee injuries and for all such reasonably necessary treatment for her right ankle injury beginning as of September 10, 1997.
2. Defendants shall pay plaintiff compensation for temporary total disability at her compensation rate for the following periods: September 10, 1997 to January 5, 1998; February 7, 1998 to March 16, 1998, and beginning again April 7, 1998 and continuing until further order of the Commission. All amounts that have accrued to date shall be paid in a lump sum subject to the attorney fee set forth below.
3. Defendants shall pay plaintiff compensation for temporary partial disability based upon sixty-six and two-thirds percent of the difference between her average weekly wage and her wages during the following periods: from January 6, 1998 to February 6, 1998 and from March 17, 1998 to April 6, 1998. These amounts having accrued shall be paid in a lump sum.
4. A reasonable attorneys fee of twenty-five percent of the compensation awarded to plaintiff herein is approved for her attorney. Twenty-five percent of the compensation accrued and due to plaintiff shall be deducted there from and paid to her counsel. Thereafter, every fourth check shall be paid directly to her attorney.
5. Defendants shall pay the costs.
IT IS FURTHER ORDERED that the parties shall have the 15 day period allowed for appeal of this matter following the filing of this Opinion and Award within which to agree and stipulate to an average weekly wage and compensation rate for plaintiff or to submit to the Full Commission a Form 22 with the appropriate calculation of wages. In the event that the parties cannot agree on the average weekly wage, failure of the defendants to comply with this order by submitting a properly completed Form 22 may result in the imposition of sanctions against defendants.
This 10th day of September 2001.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/_________ CHRIS SCOTT COMMISSIONER
DISSENTING:
 S/_______________ DIANNE C. SELLERS COMMISSIONER